# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| Zimmer, Inc., a Delaware Corporation, and Zimmer Holdings, Inc., a Delaware Corporation ) ) ) ) ) | |
| Plaintiffs, ) ) | Case No. 10 C 3170 |
| ) | Judge Manning |
| v. ) ) | Magistrate Judge Cox |
| W. Norman Scott, M.D., an Individual ) ) ) | |
| Defendant. ) | |

**MEMORANDUM OF DEFENDANT W. NORMAN SCOTT, M.D. IN SUPPORT OF HIS MOTION TO CONFIRM ARBITRATION AWARD AND DISMISS PLAINTIFFS' COMPLAINT SEEKING TO VACATE THE AWARD**

Steven L. Merouse (ARDC No.: 6243488)
Paul E. Danielson (ARDC No.: 6292658)
Sonnenschein Nath & Rosenthal LLP
233 S. Wacker Drive
Suite 7800
Chicago, Illinois 60606
Telephone No. 312.876.8000
Facsimile No. 312.876.7934

-and-

Deborah E. Lans
Ryan Weiner
Cohen Lans LLP
885 Third Avenue
New York, NY 10022
Telephone No. 212.980.4500
Facsimile No. 212.980.3448

**Preliminary Statement**[1]

The arbitration award in this action was issued nearly two years after defendant W. Norman Scott, M.D. ("Dr. Scott") commenced the arbitration against Zimmer, Inc. and Zimmer Holdings, Inc. (collectively, "Zimmer") for non-payment of royalties owed under two license agreements. During this two-year period, Zimmer undermined the integrity of the arbitration process by, inter alia, asserting knowingly false defenses. On the eve of the evidentiary hearing on the merits of the claims and defenses, Zimmer withdrew its frivolous defenses and voluntarily paid Dr. Scott 100% of the unpaid royalties that were the subject matter of the arbitration – approximately $14 million. Subsequently, Dr. Scott filed a motion seeking, inter alia, recovery of the attorneys' fees and costs he incurred as a result of Zimmer's misconduct. The Arbitration Panel (the "Panel")[2] concluded that an evidentiary hearing was necessary to determine whether Zimmer had asserted its defenses in bad faith. Exhibit 2. Following a one-day hearing, the Panel issued a Final Award. Concluding that Zimmer had in fact acted in bad faith, the Panel ordered that Zimmer reimburse Dr. Scott a portion of his attorneys' fees and costs. A copy of the Final Award is attached as Exhibit 3.

Zimmer challenges the Panel's Final Award by asserting that the Panel lacked authority to award fees. The Panel's conclusion that it possessed the inherent authority to sanction Zimmer for its bad faith conduct is based on well-settled law, and Zimmer's contention to the contrary is yet another example of Zimmer's continued willingness to assert positions (and continue litigation) no matter how untenable. Indeed, as set forth below, Zimmer refuses to so much as acknowledge that the Federal Arbitration Act, 9 U.S.C. § 1 et seq, applies to the parties'

---

[1] Per the instructions of the clerk of the Court, Defendant is also filing an independent, related action to confirm the arbitration award at issue, and Defendant anticipates these actions will be consolidated before this Court.
[2] The Arbitration Panel consisted of three arbitrators, all sophisticated and seasoned attorneys. Their biographies are attached together as Exhibit 1.

1

agreements, which indisputably affect interstate commerce.[3]

For the reasons set forth below, the Court should dismiss Zimmer's Complaint in its entirety and grant Dr. Scott's motion to confirm the arbitration award.

**Factual Background**

**A.     Parties**

Dr. Scott is a world renowned orthopedic surgeon, who specializes in knee reconstruction and replacement. Dr. Scott is a leading authority on the knee and among the most respected practitioners in the fields of adult reconstructive surgery and of sports medicine. Dr. Scott has authored 14 books on the knee, including the authoritative treatise for physicians, over 100 peer-reviewed research articles and 68 book chapters.[4]

Zimmer Holdings, Inc. is a corporation formed under Delaware law which is headquartered in Warsaw, Indiana. Zimmer is "a global leader in the design, development, manufacture and marketing of orthopaedic reconstructive implants". Zimmer has operations in 25 countries and markets its products in more than 100 countries. In 2009, Zimmer's worldwide net sales exceeded $4 billion. See, Exhibit 5. Zimmer, Inc., also a corporation formed under Delaware law, maintains its principal place of business in Indiana and is a wholly-owned subsidiary of Zimmer Holdings, Inc.

---

[3] At all pertinent times, Zimmer designed, advertised, manufactured and sold its product, specifically including those licensed under its agreements with Dr. Scott, worldwide.

[4] Dr. Scott has, among other things, served as the Head Team Physician and/or Team Orthopedist for the New York Knicks basketball team for 27 seasons, as the Team Physician for the New York Rangers for approximately 8 seasons and Team Orthopedist for the WNBA's New York Liberty team for 9 seasons. In 1992, he served as Team Physician for the USA Olympic Basketball team (dubbed the "Dream Team" because of the legendary status of its players, such as Michael Jordan, Magic Johnson and Charles Barkley). He has served as Director of the Department of Orthopedic Surgery at Beth Israel Medical Center and as its Chairman from 1996 to 2004, and is currently an associate Orthopedic Attending Physician at Lenox Hill Hospital and North Shore LIJ Health System. A copy of Dr. Scott's curriculum vitae is attached as Exhibit 4.

2

### B. The Scott-Zimmer License Agreements

In the early 1990s, Zimmer formed a small team of orthopedic physicians located throughout the United States to develop a new fixed bearing artificial knee device. The team met over a period of years to design and refine the components and crucial instrumentation for the device, eventually known as the NexGen Knee System. The system has been the subject of continuous improvement since it was initially offered for sale in late 1995.

Dr. Scott entered into the first of the agreements at issue – the NexGen License Agreement – with Zimmer on August 31, 1994. By the agreement, Dr. Scott granted Zimmer an exclusive worldwide license to manufacture and distribute the NexGen Knee System, and Dr. Scott agreed to participate in the design and development of any future knee system Zimmer might develop during the term of the agreement and to license such devices, again, exclusively, to Zimmer.

In turn, Zimmer agreed to pay Dr. Scott royalties based on Zimmer's worldwide sales of the NexGen Knee System and related products and technologies, except that no royalties are ever payable on any sales of the NexGen Knee System to or in any hospital or hospital system with which Dr. Scott is affiliated. Royalties are payable quarterly in arrears and payments are to be accompanied by royalty statements. A copy of the NexGen Agreement is attached as Exhibit 6. The parties amended the NexGen Agreement on September 12, 1995. A copy of the amendment is attached as Exhibit 7.

Zimmer has attributed the development of its "flagship" NexGen implants – implants that have generated billions of dollars in revenue for Zimmer – directly to Dr. Scott. See, Exhibits 8 and 9, at 1 (NexGen "implants . . . developed in conjunction with . . . W. Norman Scott, M.D."); see also, Exhibit 10, at fn. 11 (Zimmer website identifying Dr. Scott's research as a "[p]ioneering

3

research milestone[] [c]onducted for Zimmer to map out the design and development of the Zimmer [NexGen] Gender Solutions implant.")

In the period 1995-1997, Dr. Scott was part of a team located in the United States and Europe tasked with the development and refinement of a new device, called the Mobile Bearing Knee. Dr. Scott and Zimmer entered into a license agreement on December 1, 1996, pursuant to which Dr. Scott granted Zimmer an exclusive worldwide license to manufacture and distribute the Mobile Knee Implant device. The terms of the MBK Agreement are substantially similar to the terms of the NexGen Agreement. A copy of the MBK Agreement is attached as Exhibit 11.

    C. **The 2004 Arbitration Between the Parties and Contractual Amendments**

In 2004, Dr. Scott commenced an arbitration against Zimmer as a result of significant deficiencies in Zimmer's computation and payment of royalties to him under the NexGen and MBK license agreements, uncovered through an audit. On April 6, 2005, Dr. Scott and Zimmer resolved those disputes by entering into a Release and Settlement Agreement and, simultaneously, an Amendment to the License Agreements. By those documents the parties reaffirmed their obligations to each other under the license agreements and Zimmer agreed to pay Dr. Scott $2.4 million for back royalties. Copies of the Release and Settlement Agreement and of the Amendment are attached as Exhibits 12 and 13, respectively.

    D. **The Department of Justice Investigation of Zimmer**

In the first quarter of 2005, before the 2004 arbitration had been resolved, the United States Department of Justice ("DOJ") began an investigation of Zimmer and the four other leading U.S. orthopedic device manufacturers concerning their possible violation of the federal anti-kickback statute, 42 U.S.C. § 1320a-7b, in their dealings with surgeons or other consultants. As to Zimmer, the investigation culminated on September 27, 2007 with Zimmer's execution of a Deferred Prosecution Agreement ("DPA") with the DOJ, pursuant to which Zimmer agreed to

4

adhere to certain corporate compliance procedures as set forth in a Corporate Integrity Agreement simultaneously entered into with the Office of Inspector General of the Department of Health and Human Services and to submit to federal monitoring. Zimmer also entered into a Settlement Agreement with the United States pursuant to which Zimmer denied that any of its agreements with (among hundreds of others) Dr. Scott were illegal and in which the federal government released Zimmer from any civil liability.

During the federal investigation of Zimmer, the parties ratified and reaffirmed the NexGen and MBK license agreements in the 2005 settlement documents and again on May 17, 2006 by amending them as of January 1, 2006. Copies of the 2006 amendments are attached as Exhibits 14 and 15, respectively.

### E. Events Leading to This Arbitration – Zimmer Breaches The NexGen and MBK License Agreements

Pursuant to Articles IV through VI of each of the license agreements, Zimmer is obligated to pay Dr. Scott royalties and provide him with royalty statements on a quarterly basis. Zimmer failed to pay Dr. Scott the royalties that accrued to him under the license agreements or to provide royalty statements for the second, third and fourth quarters of 2007 and for all quarters in 2008, falsely claiming (as the Panel ultimately heard) that the DPA prohibited payment. See, Exhibits 6 and 11.

As a result, Dr. Scott commenced an arbitration against Zimmer on April 1, 2008. Dr. Scott sought an award ordering Zimmer to pay all accrued but unpaid royalties, to furnish all past due quarterly royalty reports, and to pay attorneys' fees, costs and interest.

### F. Zimmer Abandons Its Defenses on the Eve of the Hearing On The Merits And The Panel Sanctions Zimmer For Asserting Its Defenses In Bad Faith

In response to Dr. Scott's claims, Zimmer asserted a myriad of defenses that were generally predicated on the contention that it was impossible for it to make royalty payments to

5

Dr. Scott as a result of the DPA and the supervision of the federal Monitor. Zimmer asserted that the payment of royalties to Dr. Scott <u>potentially</u> violated the federal Anti-Kickback Statute, and it claimed that the federal Monitor objected to Zimmer making such payments to Dr. Scott. However, as discovery revealed, Zimmer had misrepresented not only the nature of its obligations under the DPA (which did not preclude payment), but it also withheld evidence establishing that the federal Monitor had in fact expressly consented to payment to Dr. Scott under one of the agreements – the MBK Agreement – and that Zimmer had manipulated the compliance review of the other agreement – NexGen Agreement – in an effort to disavow its significant economic obligations to Dr. Scott under that agreement. Indeed, it was shown that Zimmer <u>never</u> even asked the Monitor to rule on payment under it.

On the eve of the arbitration hearing scheduled for May 18-22, 2009, Zimmer unilaterally withdrew its defenses and announced that it would pay <u>all</u> past due royalties to Dr. Scott. Zimmer further announced that it refused to attend the scheduled hearing. <u>See</u>, Exhibit 16.

On June 5, 2009 Dr. Scott filed a motion seeking reimbursement for his attorneys' fees and costs as well as interest. On July 30, 2009, the Panel issued an Interim Award granting Dr. Scott pre-judgment interest. The Panel also directed an evidentiary hearing to determine whether Zimmer had asserted its defenses in bad faith. Exhibit 2.

The Panel also concluded in its July 30, 2009 ruling that it was vested, by two independent sources, with the authority to sanction Zimmer for the assertion of its defenses in bad faith – should the Panel so find. <u>See</u>, Exhibit 2, at pp. 10-12. First, the Panel concluded that it possessed the inherent authority to award attorneys' fees under the Federal Arbitration Act (FAA), relying on <u>ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co.</u>, 564 F.3d 81, 86 (2d Cir. 2009). In <u>ReliaStar</u>, the court found that arbitrators possess the inherent authority to sanction a party's bad faith conduct by awarding attorneys' fees under the FAA and a federal

6

court's inherent authority. Second, the Panel concluded that Indiana law allows a court or arbitrator to award fees when a party brings or continues to litigate an action or defense that is frivolous, unreasonable or groundless or litigates the action in bad faith pursuant to Indiana Code § 34-52-1-1(b).[5]

On December 28, 2009, in response to one of Zimmer's multiple challenges to the Panel's ruling, the Panel concluded – for the, by then, fourth time – that it possessed the inherent authority to award Dr. Scott legal fees. See, Exhibit 18. On January 11, 2010, the Panel held the evidentiary hearing, in Chicago, Illinois. Dr. Scott and Zimmer's Senior Vice President, General Counsel and Secretary, Chad F. Phipps, both testified at the hearing and approximately 500 exhibits were entered into evidence. The parties then submitted post-hearing briefs.

On March 25, 2010, the Panel issued its Final Award. It granted Dr. Scott's Motion for Attorneys' Fees and Costs and ordered that Zimmer pay Dr. Scott the sum of $350,000 in attorneys' fees and also reimburse him the sum of $5,624.99 for administrative fees and expenses and the compensation of the arbitrators, all within 30 days. See, Exhibit 3.

Rather than make the payments to Dr. Scott, Zimmer, with endlessly deep pockets and an appetite for litigation, filed its Complaint to Vacate Arbitration Award in the Circuit Court of Cook County on April 23, 2010 (the "Complaint"). The Complaint seeks to vacate the Final Award pursuant to Section 12 of the Illinois Arbitration Act, on the basis that the Panel exceeded

---

[5] Zimmer moved to vacate the Panel's finding that it had the authority to sanction Zimmer pursuant to Indiana Code § 34-52-1-1(b). Zimmer argued that Indiana Code § 34-52-1-1(b) precludes an award where a party has not obtained a judgment or order on the merits. Zimmer argued that since it voluntarily withdrew its defenses on the eve of the hearing and paid Dr. Scott without the issuance of a judgment, Dr. Scott could not recover attorneys' fees. On September 29, 2009, the Panel granted Zimmer's application, in part, holding that Dr. Scott could not recover his attorneys' fees under Indiana law. However, the Panel refused to cancel the hearing, as Zimmer had requested, instead reaffirming its finding that it had the inherent authority under federal law to sanction Zimmer "via an award of attorneys' fees" if it concluded that Zimmer asserted its defenses in bad faith. To assist it, the Panel also directed the parties to brief the issue in further depth, after which the Panel concluded – now, for the third time – that it did in fact have the inherent authority to award legal fees. Accordingly, it ordered the hearing on Zimmer's bad faith to proceed as scheduled. See, Exhibit 17.

7

its authority. Dr. Scott removed the action to this Court on May 24, 2010, pursuant to 28 U.S.C. §§ 1441 and 1446, on the grounds that this Court has original jurisdiction over this action because of the parties' diverse of citizenship and the amount in controversy.

## Argument

**I.     STANDARD FOR MOTION TO CONFIRM ARBITRATION AWARD[6]**

Judicial review of a commercial arbitration award is "grudgingly narrow." Gimbel v. UBS Financial Services, Inc., 2009 WL 1904554, at *4 (N.D.Ill. May 28, 2009) (citing Eljer Mfg., Inc. v. Kowin Dev. Corp., 14 F.3d 1250, 1253 (7th Cir. 1994)). The Seventh Circuit has repeatedly instructed that "judicial review of an arbitration panel's award is extremely limited." Yasuda Fire & Marine Ins. Co. v. Cont'l Cas. Co., 37 F.3d 345, 349 (7th Cir. 1994) (citing Carpenter Local 1027 v. Lee Lumber & Bldg. Material, 2 F.3d 796 (7th Cir. 1993)). "Factual or legal errors by arbitrators – even clear or gross errors – do not authorize courts to annul awards." Sphere Drake Ins. Ltd. v. All American Life Ins. Co., 2004 WL 442640, at *5 (N.D.Ill. March 8, 2004) (citing Flexible Mfg. Sys. Pty. Ltd. v. Super Products Corp., 86 F.3d. 96, 100 (7th Cir. 1996) (quoting Gingiss Int'l Inc. v. Bormet, 58 F.3d 328, 333 (7th Cir. 1995)).

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 9-11, supplies mechanisms for enforcing arbitration awards: a judicial decree confirming an award, an order vacating it, or an

---

[6] Section 6 of the Federal Arbitration Act – which is applicable to the instant action for the reasons set forth below – requires that a request to vacate or confirm an arbitration award be made by motion. 9 U.S.C. § 6. Where a party improperly seeks to challenge an arbitration award through the filing of a complaint, a court should treat such pleading as a motion. Webster v. A.T. Kearney, Inc., 507 F.3d 568, 570-571 (7th Cir. 2007); Health Services Mgmt. Corp. v. Hughes, 975 F.2d 1253, 1257-1258 (7th Cir. 1992). Accordingly, Dr. Scott respectfully requests that the Court treat Zimmer's Complaint as a motion to vacate rather than a pleading. In the event, however, the Court declines to do so, Dr. Scott seeks dismissal of the Complaint, pursuant to Fed.R.Civ.P. 12(b)(6), for the reasons set forth herein. A court must dismiss a plaintiff's complaint where it fails to state a claim for which relief may be granted. Keel v. City of Harvey, 2010 WL 310768, at *1 (N.D.Ill. Jan. 21, 2010) (citing Justice v. Town of Cicero, 577 F.3d 768, 771 (7th Cir. 2009)). While a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor, a court is not obliged to accept the complaint's legal conclusions as true. Coleman v. U.S., 454 F.Supp.2d 757, 759-760 (N.D.Ill. 2006) (internal citations omitted).

order modifying it.[7]  Trustmark Ins. Co. v. Clarendon Nat'l Ins. Co., 2009 WL 4043110, at *2 (N.D.Ill. Nov. 20,2009) (citing Hall Street Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576 (2008)).  Under the terms of 9 U.S.C. § 9, a court "must" confirm an arbitration award "unless" it is vacated, modified, or corrected "as prescribed" in 9 U.S.C. §§ 10 and 11.  Id.  In the absence of grounds to vacate or amend – neither being present in this case – the FAA leaves no room for a course of action other than the confirmation of the arbitral award.  Trustmark, 2009 WL 4043110, at *2.

Section 10(a) of the FAA sets forth the narrow grounds on which an arbitration may be vacated.  Zimmer's Complaint invokes only the fourth ground -- that the arbitrators exceeded their powers or executed these powers so imperfectly, that a mutual, final and definite award was not made.  9 U.S.C. §§10(a)(1)-(4).[8]

## II. THE FEDERAL ARBITRATION ACT GOVERNS THE PARTIES' ARBITRATION

The FAA was enacted pursuant to the commerce clause, U.S. Const., Art. I, § 8, cl.3. Perry v. Thomas, 482 U.S. 483, 490 (1987).  The FAA applies to any contract "evidencing a transaction in commerce".  Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 112 (2001); Kiefer Specialty Flooring, Inc. v. Tarkett, Inc., 174 F.3d 907, 909 (7th Cir. 1999); see also,

---

[7] Zimmer asserts that the Illinois Uniform Arbitration Act – as opposed to the Federal Arbitration Act – applies to this action  See, Complaint ¶ 38.  As set forth in more detail below, because the parties' license agreements indisputably affect interstate commerce, Zimmer's assertion that the state act applies is untenable.  The "Supreme Court has held that when a contract involving interstate commerce contains an arbitration clause, federal law supersedes State statutes, even in State courts.  Aste v. Metropolitan Life Ins. Co., 312 Ill.App.3d 972, 728 N.E.2d 629, 245 Ill.Dec. 547 (2000) (quoting Konewko v. Kidder, Peabody & Co., 173 Ill.App.3d 939, 942, 123 Ill.Dec. 617, 528 N.E.2d 1, 3 (1988)); see also, Carey v. Richards Building Supply Co., 367 Ill.App.3d 724, 726, 856 N.E.2d 24, 26, 305 Ill.Dec. 492, 494 (2006); Cecala v. Moore, 982 F.Supp. 609, 612 (N.D.Ill. 1997).

[8] Zimmer seeks to vacate the Final Award on the sole basis that the Panel exceeded its authority pursuant to Section 12(3) of the Illinois Uniform Arbitration Act.  Complaint ¶ 38.  The grounds for vacating an arbitration award under the Illinois Uniform Arbitration Act and FAA are virtually identical in that both statutes provide for vacating an award where the arbitrators exceeded their powers and such provisions have been similarly interpreted by opinions out of the Illinois and federal courts.  Raymond Professional Group, Inc. v. Pope, 397 B.R. 414, 426-429 (Bankr. N.D.Ill. 2008).

Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52 (1995). The FAA provides that an arbitration clause in "a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract". 9 U.S.C. § 2. The Supreme Court has interpreted the words "involving commerce" as the functional equivalent of the phrase "affecting commerce," which ordinarily signals Congress' intent to exercise its Commerce Clause powers to the fullest extent. Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 53 (2003) (citing Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 273-274 (1995)). Accordingly, where a contract containing an arbitration provision "affects" interstate commerce, disputes arising thereunder are governed by the FAA. Id.

Here, it cannot be disputed that the parties' agreements "affect" interstate commerce. First, the License Agreements – including all amendments – are between Dr. Scott, a citizen of New York, and Zimmer, Inc., a Delaware corporation whose principal place of business is in Indiana. See e.g., Exhibits 6, 11-13. Second, and most importantly, the License Agreements grant worldwide licenses to manufacture products that are designed, manufactured, advertised, distributed, sold and used nationally and internationally. See Exhibits 6 and 11, at Art. III; See also, Exhibit 5.

### III. FEDERAL, NOT INDIANA, LAW CONTROLS THE ISSUE OF THE PANEL'S INHERENT AUTHORITY TO AWARD DR. SCOTT ATTORNEYS' FEES

Zimmer asserts that the Panel exceeded its authority because the Panel was required to apply the law the parties selected in the choice of law clause (Article XX) to govern the construction of their agreements (Indiana law) to the issue of whether the Panel has inherent authority to impose sanctions. Complaint ¶¶ 30, 39. In so arguing, Zimmer obfuscates the distinction between a choice of law clause and an arbitration clause. In fact, Zimmer's position is contrary to United States Supreme Court and Seventh Circuit precedent which expressly hold

10

that a generic choice of law clause does <u>not</u> govern the scope of the relief available to an arbitrator.

Article XX of each of the License Agreements states that the agreements "shall be <u>construed</u> in accordance with the laws of the State of Indiana." <u>See</u>, Exhibits 6 and 11, at Art. XX (emphasis added). The choice of Indiana law to govern the <u>construction</u> of the agreements does not govern the scope of the Panel's authority, <u>inter alia,</u> to award fees. Under United States Supreme Court precedent, <u>Mastrobuono v. Shearson Lehman Hutton, Inc.</u>, 514 U.S. 52 (1995), a choice of law provision <u>cannot</u> be read to include special rules of state law limiting the authority of arbitrators, because those rules are preempted by federal law in any arbitration governed by the FAA. Rather, the <u>arbitration clause</u> of the parties' agreement (and any arbitral rules thereby invoked) governs the Panel's authority to award relief, such as punitive damages or attorneys' fees.

In <u>Mastrobuono</u>, the arbitration panel had awarded punitive damages. The Illinois district court and the Court of Appeals for the Seventh Circuit had declined to confirm the punitive damages award because the parties' contract specified that "the laws of the State of New York" would govern the agreement and because New York law prohibits arbitrators from awarding punitive damages. <u>Mastrobuono</u>, 514 U.S. at 54-55.

The Supreme Court reversed, ruling that the broad arbitration clause in the parties' agreement governed the authority of the arbitrators for two reasons: first, the FAA preempts any state law rules purporting to limit the remedial powers of arbitrators and, second, because:

> the best way to harmonize the choice of law provision with the arbitration provision is to read "the laws of the State of New York" to encompass substantive principles that New York courts would apply, <u>but not to include special rules limiting the authority of arbitrators</u>. Thus the choice of law provision covers the rights and duties of the parties, while the arbitration clause covers the arbitration; neither sentence intrudes upon the other. <u>Id</u>. (emphasis added).

11

Painewebber Inc. v. Bybyk, 81 F.3d 1193 (2d Cir. 1996), and Shearson Lehman Bros., Inc. v. Neurosurgical Associates of Indiana, P.C., 896 F.Supp. 844, 847-848 (S.D.Ind. 1995), have both applied the reasoning of Mastrobuono to the specific issue of attorneys' fees. In Bybyk, Painewebber argued that claimants could not submit their claim for attorneys' fees to arbitration because the parties' agreement and its enforcement were contractually "governed by the laws of the State of New York" and under New York caselaw the issue of attorneys' fees may not be submitted to an arbitrator unless the agreement specifically so provides. The Circuit Court rejected that argument and upheld the authority of the arbitrators to award fees, ruling that a "choice of law provision will not be construed to impose substantive restrictions on the parties' rights under the Federal Arbitration Act, including the right to arbitrate claims for attorneys' fees." 81 F.3d. at 1202 (emphasis added); see also, Nat'l Union Fire Ins. Co. v. Odyssey America Reinsurance Corp., 2009 WL 4059183 (S.D.N.Y. Nov. 18, 2009).

In Neurosurgical, likewise, an Indiana-based Federal District Court held that Mastrobuono compelled the conclusion that the choice of law clause in the parties' arbitration agreement did not govern the scope of the arbitrators' authority to award punitive damages and fees. Accord, Flexible Mfg. Systems Pty. Ltd. v. Super Products Corp., 86 F.3d 96, 99 (7th Cir. 1996); Sage Popovich, Inc. v. Colt International, Inc., 588 F.Supp.2d 913, 917 (N.D.Ind. 2008). The law is equally clear in other Seventh Circuit cases. A generic choice of law provision does not extend to the arbitration clause absent specific evidence the parties intended it to do so. Vazquez v. Central States Joint Bd., 547 F.Supp.2d 833, 865 (N.D.Ill. 2008) ("a general choice of law provision in a contract will not extend to the arbitration clause, absent specific evidence the parties intended it to do so."); BEM I, L.L.C. v. Anthropologie, Inc., 2000 WL 1849574, at *6 (N.D.Ill. Dec. 15, 2000) (same); Paul Davis Systems of Northern Illinois Inc. v. Paul W.

Davis Systems, Inc., 1998 WL 749041, at *1 (N.D.Ill. Oct. 15, 1998) (the FAA applied to the arbitration despite choice of law clause choosing Florida law).

Here, there exists no evidence that the parties intended that Indiana law should apply to the arbitration clauses. Accordingly, (as the Panel concluded five times), the choice of law clauses in the Zimmer-Scott agreements (at Article XX of each), did not, as a matter of law, impose substantive restrictions on Dr. Scott's right to arbitrate his claim for attorneys' fees. Rather, as the cited line of cases establish, the arbitration clause in the Zimmer-Scott agreements governed by the FAA is the source of the Panel's authority to award Dr. Scott his attorneys' fees.

### IV. UNDER THE PARTIES' ARBITRATION AGREEMENT, THE PANEL HAS THE AUTHORITY TO AWARD FEES

Where, as here, the parties' agreement to arbitrate is broad, any issue that would otherwise be settled in a court can, at a minimum, be determined by an arbitrator and any inherent authority a court would have is likewise possessed by an arbitrator. See, Mastrobuono, 514 U.S. at 61, relying on Mitsubishi Motors Corp. v. Solar Chrysler-Plymouth, Inc., 473 U.S. 614 (1985), and also citing Raytheon Co. v. Automated Business Systems, Inc., 882 F.2d 6, 10 (1st Cir. 1989).

The Zimmer-Scott agreements contain a broad arbitration clause that vests the Panel with the "right to award . . . any relief which [it] deems proper . . ." See, Exhibits 6 and 11, Art. XXI (emphasis added). This broad language unquestionably provided the Panel with the inherent authority to award attorneys' fees pursuant to the FAA. See e.g., Bybyk, 81 F.3d at 1202 (an arbitration clause providing that "any and all controversies" be submitted to arbitration was sufficiently broad to permit the arbitrator to award attorneys' fees, because agreement did not contain an any express limitation on the award of fees). Indeed, the Panel in this case expressly acknowledged in its Interim Award that it was vested with this inherent authority, Interim Award, at p. 9, citing ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co., 564 F.3d 81, 86 (2d

13

Cir. 2009). In <u>ReliaStar</u>, also an arbitration governed by the FAA, the parties' agreement included a separate clause stating that "each party shall bear the expense of its own . . . attorneys' fees." 564 F.3d. at 84. Even with this clause, the Circuit Court held that the FAA vested the arbitrators with the <u>inherent authority</u> to award attorneys' fees as a result of the party's bad faith conduct under the broad, general arbitration clause. <u>Id</u>. at 86.

>As the <u>ReliaStar</u> court stated:
>
>Where an arbitration clause is broad, arbitrators have the discretion to order such remedies as they deem appropriate . . . Consistent with this principle, we here clarify that a broad arbitration clause . . . confers inherent authority on arbitrators to sanction a party that participates in the arbitration in bad faith <u>and that such a sanction may include an award of attorney's or arbitrator's fees</u>.

<u>Id.</u> at 86.

>As the <u>ReliaStar</u> court further stated:
>
>"As a general rule, each party to an arbitration must bear its own fees associated with an arbitration action . . . *Nevertheless . . . the FAA . . . grant[s] wide authority to the arbitrator to determine entitlement to attorneys' fees.* Under some circumstances, the prevailing party may recover attorneys' fees . . . *if justified by circumstances in which the losing party acted in bad faith . . .*" Indeed, the underlying purposes of arbitration, *i.e.*, efficient and swift resolution of disputes without protracted litigation, could not be achieved but for good faith arbitration by the parties. Consequently, sanctions, including attorneys' fees, are appropriately viewed as a remedy within an arbitrator's authority . . .

<u>Id</u>. at 87 (quoting, 1 Martin Domke, <u>Domke on Commercial Arbitration</u> § 35:8 (3d ed. 2008)(former emphasis added, later emphasis in original)).

Similarly, in <u>Todd Shipyards Corp. v. Cunard Line, Ltd.</u>, 943 F.2d 1056, 1064 (9th Cir. 1991), the Circuit Court recognized an arbitrator's authority to award attorneys' fees pursuant to the bad faith exception to the general "American Rule" that each party bears its own attorneys' fees. The court stated:

>Federal law takes an expansive view of arbitrator authority to decide disputes and fashion remedies . . . In light of the broad power of arbitrators to fashion appropriate remedies and the accepted 'bad faith conduct' exception to the

14

American Rule, we hold that it was within the power of the arbitration panel in this case to award attorneys' fees.

See also, Marshall & Co. v. Duke, 114 F.3d 188, 190 (11th Cir. 1997) ("arbitrators have the power to award attorney's fees pursuant to the "bad faith" exception to the American Rule that each party bears its own attorney's fees.") Indeed, Zimmer's reliance solely on patently inapplicable Illinois arbitration law is, like its defense on the merits, lacking in any substance.

## Conclusion

For the foregoing reasons, W. Norman Scott, M.D. respectfully requests that his motion to confirm the arbitration award and to dismiss plaintiffs' dilatory action be granted in its entirety, together with such other relief as the Court finds appropriate.

Dated: May 28, 2010

Respectfully submitted,

By:   /s/ Paul E. Danielson
     One of the attorneys for the Defendant
     W. Norman Scott, M.D.

Steven L. Merouse (ARDC No.: 6243488)
Paul E. Danielson (ARDC No.: 6292658)
Sonnenschein Nath & Rosenthal LLP
233 S. Wacker Drive
Suite 7800
Chicago, Illinois 60606
Telephone No. 312.876.8000
Facsimile No. 312.876.7934

   -and-

Deborah E. Lans
Ryan Weiner
Cohen Lans LLP
885 Third Avenue
New York, NY 10022
Telephone No. 212.980.4500
Facsimile No. 212.980.3448

15

## CERTIFICATE OF SERVICE

I, Paul E. Danielson, an attorney, hereby certify that on May 28, 2010, the above and foregoing **Memorandum in Support of Motion to Confirm Arbitration Award and Dismiss Plaintiffs' Complaint Seeking to Vacate the Award** was filed with the Clerk of the Court using the CM/ECF system which will automatically send notification to:

    Michael S. Elvin, Esq.
    Chico & Nunes, P.C.
    333 West Wacker Drive, Suite 1800
    Chicago, IL 60606
    Melvin@chiconunes.com

                                               /s/  Paul E. Danielson_____
                                               Paul E. Danielson

14860187